**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:20-CR-186-1 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| DAVID A. PECE, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

On March 12, 2020, an indictment was filed charging defendant David A. Pece ("Pece") and four other individuals with the following: Count One—conspiracy to engage in sexual exploitation of children, in violation of 18 U.S.C. §§ 2251(a) and (e); Count Two—sexual exploitation of children, in violation of 18 U.S.C. §§ 2251(a) and 2; Count Three—conspiracy to receive visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1); and Count Four—conspiracy to access with intent to view child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). (Doc. No. 1.)

Now before the Court are two motions filed by Pece: a motion to suppress (Doc. No. 98), and a motion to reopen the detention hearing (Doc. No. 86). Plaintiff United States of America (the "government") opposes these motions. (Doc. No. 102 (Opposition to Motion to Suppress); Doc. No. 88 (Opposition to Motion to Reopen Detention Hearing).) On August 13, 2021, and continuing on August 16, 2021, the Court held an evidentiary hearing on the suppression motion.

At the conclusion of the hearing on August 16, 2021, the Court took the pending motions under advisement and permitted the parties to file post-hearing briefs addressing the issues raised during the suppression hearing. (Doc. No. 109 (Pece's Post-Hearing Brief); Doc. No. 110 (Government's Post-Hearing Brief).) For the reasons that follow, the motions are denied.

### I.  MOTION TO SUPPRESS

#### A.  Relevant Background

Pece seeks to suppress all evidence obtained from a search of his Dell laptop computer, which he turned overed to the FBI on May 11, 2018, and all statements he made to law enforcement on May 11, 2018 and May 12, 2018, on grounds that the search was conducted without valid consent and the statements were made involuntarily. At the evidentiary hearing, FBI Special Agent ("S.A.") David Desy ("Desy") and FBI S.A. Adam Christensen testified on behalf of the government. Pece's father, David M. Pece ("Dave"), Pece's mother, Laurette Keider, and Dr. Mark Lovinger were called as witnesses by the defense. Pece also testified on his own behalf.

On May 11, 2018, FBI agents executed a search warrant at Pece's home in Highland Heights, Ohio where he lived with his father. The search warrant was linked to an investigation in which Pece, then 28 years of age, was believed to be involved in a group using one or more websites to unlawfully interact with underaged girls. Specifically, S.A. Christensen testified that he had been investigating criminal activity relating to a website called "chateen.com" for several years. By assuming the online persona of an informant with whom law enforcement was working, he learned how Pece and the other members of his group worked collectively to lure underaged girls into private secure chatrooms for the purpose of convincing them to engage in

sexually explicit conduct on web camera for the gratification of the group.[1]

Pece and his father were in Virginia Beach, VA vacationing at the time of the search of the residence. At approximately 6:45 a.m. on May 11, 2018, S.A. Christensen contacted Dave on his cell phone and advised him of the search. During the phone call, Dave consented to have an agent meet him and Pece in Virginia Beach to turn over his son's laptop, which Pece had brought with him on vacation. S.A. Christensen testified that, at some point during the phone call, Dave handed the phone to his son, Pece. According to S.A. Christensen, he and Pece were able to communicate effectively and Pece never asked him to repeat any questions or otherwise gave any indication that he was unable to comprehend or follow the thread of the conversation. Moreover, S.A. Christensen testified that Pece's answers to his general inquiries regarding Pece's online activities were responsive.[2]

*May 11, 2018 Grocery Store Parking Lot Meeting Virginia Beach, VA*

Later that day, Pece and his father met with FBI S.A. Desy in a Virginia Beach grocery store parking lot. The parties exited their respective vehicles and spoke while standing in the parking lot. During the encounter, Pece and the agent executed two documents: (1) Form FD-941, Consent to Search Computer(s) (Gov. Ex. 1), and (2) Form FD-597, Receipt for Property

---

[1] Each member is alleged to have had a different role. One individual would serve as the "hunter" and was responsible for identifying potential victims and encouraging them to visit a particular chatroom that was controlled by the group. If the victim needed encouragement to follow the "hunter", a "looper" would play a pre-recorded video depicting a minor boy or girl to convince the victim that she was interacting with another minor when, in fact, she was communicating with a grown man. Once inside the designated chatroom, a "talker" would take over, and this person's goal was to convince the victim to undress and engage in sexual activity. Finally, a "watcher" would provide security for the group to shield its activities from authorities and other individuals using the website.

[2] Nevertheless, S.A. Christensen also testified that he did not agree with everything that Pece told him in that telephone conversation. For example, the agent noted that while Pece told him that he had not been on the website MyAOL.com for a long time, he learned through his investigation that Pece had recently visited the website.

Received/Returned/Released/Seized (Gov. Ex. 2). S.A. Desy testified that, in accordance with his general practice, he verbally reviewed the forms with Pece as he and Pece filled out the forms together. At no time did Pece advise that he could not hear the agent or need anything repeated. According to S.A. Desy, Dave was standing near his son as the agent and Pece spoke. Upon being prompted by the agent, Pece supplied the password for the computer and wrote it on the form. (*See* Gov. Ex. 1.) Before David signed the form, S.A. Desy read aloud the portion that provided:

> I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind.

(*Id.*)

S.A. Desy indicated that neither Pece nor his father had any questions regarding the form or the process by which the computer would be searched. He further testified that Pece's responses to his questions were appropriate and demonstrated that he comprehended and followed the flow of the conversation. S.A. Desy testified that he followed the same procedure with the property receipt form, reading it aloud to Pece as the two filled out the form, and Pece signed it indicating that he understood that the laptop was being taken into federal custody. (*See* Gov. Ex. 2.) Because his role in the investigation was limited to securing the laptop for analysis, S.A. Desy explained that he did not ask Pece any questions relative to his online activities.

Dave and Pece also offered testimony regarding the encounter in the parking lot. Dave testified that he did not recall ever seeing either the consent form or the property receipt form, and he did not remember S.A. Desy reading any portion of either form to Pece. In fact, he testified that he only remembered his son verbally giving the agent the password to his computer.

Further, while he did not remember Pece filling out any part of the forms, he conceded that his son's handwriting appears on the consent form. Pece likewise testified that he did not remember the agent reading either form to him though he, too, conceded that his handwriting appeared on the forms. To the extent that Dave and Pece's testimony regarding how the meeting in the parking lot unfolded conflicts with that of S.A. Desy, the Court credits the agent's account. Understandably, Dave was emotional when he discovered the nature of the FBI's investigation into his son's online activities. Nevertheless, his answers during the hearing were generally evasive and lacking in complete candor, especially when the questioning was directed to subject matters that either implicated his son or could negatively impact the outcome of the present motions.[3] Pece's testimony during the hearing was equally equivocal and vague, and, like his father, his answers became increasingly ambiguous as the hearing progressed.[4]

*May 12, 2018 Interviews at FBI Cleveland Field Office*

That same evening (May 11, 2018), S.A. Christensen called Dave again and the two made arrangements for him and Pece to meet with agents in Cleveland the following day (May 12, 2018). On May 12, 2018, S.A. Christensen and FBI S.A. Lisa Hack met with Dave and Pece at the FBI Cleveland field office to conduct the interviews. It was a Saturday, and the building was closed to the public, but the agents arranged for Pece and his father to park in the FBI

---

[3] For example, while he testified that he and Pece had multiple conversations during the long drive home from Virginia Beach regarding the FBI's interest in Pece's computer, Dave was combative—offering only vague or cryptic responses—when the government's counsel attempted to elicit the nature of these conservations. He ultimately testified unconvincingly that he never asked his son whether he engaged in the unlawful conduct the FBI was investigating.

[4] Many of Pece's answers on cross-examination were cryptic and guarded. In response to pointed questions regarding his knowledge of his own online activities, Pece often answered with responses like "probably" or "maybe" or "I don't know." And while he remembered portions of an online chat with an underaged girl named Trinity, he claims that did not remember telling her, in response to her comments that she was contemplating suicide, that he still wanted to view her on the web camera.

parking garage. Before entering the building, Pece and Dave were searched by the agents. S.A. Christensen did not believe that he was wearing his firearm at the time of the meeting, and Dave did not remember seeing either agent with a weapon.

Once inside the building, Pece and Dave were placed in separate interview rooms. Neither man was restrained, and there is no evidence that the interview room doors were locked. The interviews were recorded, and clips from each interview were played at the hearing. (Gov. Ex. 4 (Dave Interview); Gov. Ex. 5 (Pece Interview).)[5] The agents met first with Dave. At the start of Dave's interview, S.A. Christensen explained why he wanted to speak with his son and the illegal acts he believed Pece had committed. While he explained that Pece did not have to speak with him, he recommended that Pece do so, noting that it could help his case if he cooperated. Responding to Dave's inquiries, the recording reflects that S.A. Christensen advised that the serious charges Pece was facing generally resulted in sentences of imprisonment of ten to fifteen years.

From the intonation in his voice, it was evident that Dave was upset with his son and overwhelmed by the news that his son was facing serious criminal charges. Naturally, he also expressed concern for his son. He questioned out loud whether he should retain a lawyer and indicated that he was not sure whether his son should speak with the agents. S.A. Christensen confirmed that it was Pece's right not to speak with them and that not cooperating was "certainly a way to go," but he explained that it would be perceived as more helpful if Pece cooperated. Still, the agent repeated that Pece was facing serious charges, and he added that he would be

---

[5] Dave's interview was approximately 30 minutes, and Pece's interview lasted under one hour, including a final portion of the interview that included Pece, Dave, and the agents. The Court has reviewed these recordings in their entirety.

charged federally whether or not he chose to speak with the agents.

Dave expressed his belief that his son would not make it in prison. He shared that Pece had been born extremely premature, weighing barely a pound at birth. As a result of his premature delivery, he suffered from numerous medical conditions, including a partial loss of hearing. Dave explained that Pece wore hearing aids in both ears and had an adult sign language interpreter with him throughout high school. However, at no time did Dave suggest that Pece would be unable to speak with the agents without an interpreter or that he would be unable to hear when they interviewed him. Moreover, although Dave described Pece as an "immature 28" year old, he agreed that Pece was "able to understand and make his own decisions." S.A. Hack explained that, because Pece was an adult, the decision whether to cooperate ultimately rested with him and that they were only speaking with Dave as a courtesy. She suggested that they let Pece make up his own mind. Dave agreed but asked if he could speak with Pece first, and the agents permitted the two men to talk privately for several minutes before the agents interviewed Pece separately.

At the beginning of Pece's interview, S.A. Christensen advised Pece that he was not under arrest but explained that he was going to read him his rights because the agents would be asking questions about Pece's potential criminal activity. There is no dispute that the warnings complied with the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). (*See* Gov. Ex. 3 (Advice of Rights Form).) After S.A. Christensen recited the *Miranda* rights, there appears a period of silence on the recording when Pece read to himself the rights that had just been recited. S.A. Christensen then asked Pece to read out loud the following statement appearing at the bottom of the Advice of Rights form:

> I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

(*Id*.) The agent then asked Pece if it was true that he was willing to answer questions without a lawyer present, and Pece answered "yes." Pece then signed the form.

The interviewed lasted less than an hour. During the interview, Pece spoke of his involvement with the group under investigation and his role in the solicitation, recording, and sharing of child pornography. Pece's answers to the agent's questions were responsive and often extended beyond simple "yes" and "no" answers. When asked if he ever visited the website MyAOL.com, Pece indicated that he was familiar with the website but insisted that he had not visited the website recently. S.A. Christensen informed Pece that he had information that confirmed that Pece had visited the website recently. He then advised Pece that his best course was to answer the questions truthfully, and the questioning continued. At no time did Pece ask to have any questions repeated or otherwise indicate that he did not hear the question. Likewise, he never advised the agents that he did not understand their questions or the reason they were speaking with him.

S.A. Christensen informed Pece that he was aware that girls who have been lured into certain chatrooms are often blackmailed. Pece responded, "I have never in my entire life blackmailed any girls. I would never do that." And when the agent broached the subject of physical contact with the teen victims, Pece answered adamantly, "Whoa, whoa, I would never do that." Pece insisted that he never met up with any of the girls he met online. While S.A. Christensen clearly stated that Pece's online activity with underaged girls was a serious problem, the agent stressed that it would be a more egregious problem if Pece had engaged in any physical sexual contact with these girls. He asked Pece if he would be willing to take a polygraph test to

8

confirm that he was telling the truth about his lack of physical contact with the girls, and Pece indicated that he would be willing to do so.

Following this exchange, S.A. Christensen asked Pece if he had any questions. Recognizing the gravity of the situation, Pece asked if he was going to be put in jail and lose his job. S.A. Christensen advised Pece that both were likely outcomes. Pece also asked when he would get his computer back. S.A. Christensen informed Pece that it would be a while because it would take time for the computer to be searched. S.A. Hack added that, if the search revealed contraband on the computer, the agents would not be able to return the laptop to him. Pece indicated that he understood.

At the conclusion of the interview, the agents met with Pece and Dave together and explained the next steps of the investigation. Dave became agitated when S.A. Christensen informed him that they wanted his son to take a polygraph test. S.A. Christensen quickly explained that it was Pece's choice and that he was not required to submit to such an examination. He then advised both men that there were going to be federal charges filed against Pece and that they would need to prepare for that eventuality. Immediately thereafter, Pece and his father left the station. Pece subsequently refused to take to a polygraph test.

### B.    Law and Discussion

 Pece maintains that both the consent he gave on May 11, 2018 to search his laptop and the waiver of his *Miranda* rights on May 12, 2018 were obtained in violation of his constitutional rights. It is Pece's position that the agents manipulated him, "a deaf, cognitively disabled young man with an IQ of 76 and a 5th grade reading level, into providing his laptop to the FBI without explaining his right to refuse consent and without providing him with a sign language

interpreter." (Doc. No. 98 at 7.) Similarly, Pece posits that his statements to law enforcement on May 12, 2018 were involuntary because the "agents took advantage of [Pece's] disabilities, his need for an interpreter, and his state of mind." (*Id*. at 9.)

### 1. Constitutionality of the Interview on May 12, 2018

Beginning with the interview on May 12, 2018, Pece argues that the "[u]nrefuted expert evidence presented at the hearing demonstrates that [Pece] is mentally retarded and could not possibly have understood his rights[.]" (Doc. No. 109 at 3.) In support, Pece first refers to the expert report of Dr. James J. Karpawich, Ph.D., who did not testify at the hearing but whose report is appended to Pece's motion. (*See* Doc. No. 99-2.) In his report, Dr. Karpawich determined that Pece had a full scale IQ of 76, placing his intellectual functioning in the borderline range. He concluded that Pece "has difficulty understanding, processing, and remembering information, especially when information is complex and/or when a sign language interpreter is not used." (*Id*. at 12.) Dr. Karpawich opined that, given his deficits in abstract reasoning and problem solving, Pece would have difficulty comprehending certain concepts, such as the legal rights discussed in the standard *Miranda* warnings. (*Id*.)

Pece also points to the expert report of Dr. Lovinger and the testimony he gave at the suppression hearing. In his report, Dr. Lovinger likewise expressed concerns that Pece was cognitively impaired. (*Id*.) He observed that Pece "does not lie," and that he often reflexively agrees or indicates that he understands something when in fact he does not because he is eager to please. Like Dr. Karpawich, Dr. Lovinger opined that Pece "did not understand his rights when he turned over his laptop computer to the FBI agent in Virginia and when he made statements to the FBI agent in May of 2018[.]" (*Id*. at 8.) Relying on these assessments, Pece argues that the

10

waiver of his *Miranda* rights was not knowing, intelligent, or voluntary.

It is the government's position that Pece was never placed in custody on May 12, 2018, and, as such, *Miranda* warnings were not even required (even though they were given prior to the interview). Therefore, the Court must first determine whether Pece was in custody at the time of his interview.

*Custody*

The Fifth Amendment, as interpreted in *Miranda*, protects against un-counseled statements made during custodial interrogations in the absence of a knowing, voluntary, and intelligent waiver of the right against self-incrimination and the right to counsel. *Frazier v. Jenkins*, 770 F.3d 484, 502 (6th Cir. 2014). These protections apply to statements made during a "custodial interrogation"—i.e., during "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444; *see also United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (explaining that *Miranda* requirements apply "only when there has been such a restriction on a person's freedom as to render him 'in custody'"). "A suspect is 'in custody' for purposes of receiving *Miranda* protection if there has been a 'formal arrest or restraint on freedom of movement.'" *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)).

"'[T]the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *Id.* (quoting *Stansbury v. Ca.*, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994)). "'[T]he only relevant inquiry is how a reasonable man in the

11

suspect's position would have understood his situation." *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)). "The reasonable person test is appropriate because, unlike a subjective test, it does not 'place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question.'" *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1990) (quoting *Berkemer*, 468 U.S. at 442 n.35). Several factors guide the analysis, including: "(1) the location of the interview; (2) the length and manner of questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *Hinojosa*, 606 F.3d at 883; *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). In the Sixth Circuit, courts must consider the totality of the circumstances surrounding the encounter, "with the ultimate inquiry turning on whether a formal arrest occurred or whether there was a restraint on freedom of movement of the degree associated with a formal arrest. *Panak*, 552 F.3d at 465 (quotation omitted). As the defendant seeking suppression, Pece bears the burden of proving by a preponderance of the evidence that he was subjected to a custodial interrogation. *See United States v. Lawrence*, 892 F.2d 80, 1989 WL 153161, at *5 (6th Cir. 1989).[6]

---

[6] Defense counsel expressed some confusion at the hearing regarding the Court's observation that each side bore some burden of proof with respect to the suppression motion. Of course, as set forth more fully in in this decision, the Court was referring to the fact that Pece bore the initial burden to demonstrate that he was in custody, while the government retained the ultimate burden of establishing that Pece's statements to the officers and the consent to search the laptop were voluntary.

The Court finds that the factors favor a finding that Pece was not in custody at the time of his interview. First, it is undisputed that he was told that he was not under arrest and he was not formally arrested, and while he was searched upon his arrival, he was never physically detained, such as by the use of handcuffs or even a locked door, and the officers did not brandish or display any weapons at any time during the encounter. *See, e.g., United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1988) ("Perhaps most significantly, Agent Williamson specifically advised Salvo . . . that he was not under arrest, that he was free to leave at any time, and that he would not be arrested at the conclusion of the interview."); *id.* (noting that suspect was "never handcuffed or otherwise physically restrained, nor was he told he was under arrest or even threatened with arrest or told to 'stay put'"). Second, the number of agents—here only two—supports a finding that the interview was non-custodial. *See, e.g., United States v. Ellison*, 791 F.2d 821, 823 (10th Cir. 1986) (attendance of three agents did not transform interview into custodial interrogation); *see also United States v. Conder*, 529 F. App'x 618, 619, 623 (6th Cir. 2013) (three agents during in-home interview not custodial). Third, the meeting was not unnecessarily lengthy or prolonged, lasting less than one hour. *See, e.g., United States v. Mahan*, 190 F.3d 416, 420–22 (6th Cir. 1999) (affirming denial of motion to suppress where interview "lasted approximately an hour and thirty-five minutes").

Additionally, the location of the meeting—a field office of the FBI—although perhaps "inherently intimidating," *see Salvo*, 133 F.3d at 951, was not unduly hostile or coercive. *See Mathiason*, 429 U.S. at 495. Nearly "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a

crime." *Mathiason*, 429 U.S. at 495. Indeed, the setting was no more coercive than the setting of other encounters where courts have determined the Fifth Amendment was not implicated. *See, e.g., California v. Beheler*, 463 U.S. 1121, 1122, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (questioning at police station); *Mathiason*, 429 U.S. at 495 (same); *Mason v. Mitchell*, 320 F.3d 631–32 (6th Cir. 2003) (interviews at Sheriff's office and interrogation room in basement of city hall); *Ellison*, 791 F.2d at 823 (interview at United States Attorney's office following police escort to office).[7]

Based upon the totality of circumstances, the Court finds that no custodial interrogation occurred, because a reasonable person in Pece's shoes "would have felt that he could elect to leave or terminate the interview." *United States v. Protsman*, 74 F. App'x 529, 535 (6th Cir. 2003). Because Pece was not in custody at the time of the interview, the agents were not required to administer *Miranda* warnings, and there was no requirement that he intelligently, knowingly, and voluntarily waive those rights before the agents spoke with him (even though the Court finds that he did). *See Illinois v. Perkins*, 496 U.S. 292, 297, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990); *J.D.B. v. N.C.*, 564 U.S. 261, 269–70, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011) (*Miranda* warnings required only prior to interrogation of suspect who is in custody).

*Voluntariness*

Even if Pece was not in custody, however, his statements should be suppressed if they were the product of coercion and, therefore, involuntary. *See Macklin*, 900 F.2d at 951 ("Even if *Miranda* warnings are not required, a confession cannot be used if it is involuntary.") (collecting

---

[7] Indeed, the setting was made even less intimidating by the fact the FBI field office was closed at the time of the interview, and after the agents initially met with Pece's father, Pece's father was permitted to speak privately with Pece before Pece was interviewed.

Supreme Court authority). "In determining whether a confession has been elicited by means that are unconstitutional, [the Court] looks to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case." *Mahan*, 190 F.3d at 422 (quotation marks and citation omitted). "Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Id*. at 422–23; *see McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)). The government bears the burden of proving by a preponderance of the evidence that the confession was voluntary. *Mahan*, 190 F.3d at 4221 (citing *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992)).

Pece claims that agents knew of his physical and cognitive deficiencies and exploited them in order to obtain incriminating statements. However "mental disability alone does not render a confession involuntary. A defendant must also prove coercion, since 'coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause . . . .'" *Macklin*, 900 F.2d at 951 (quoting *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 522, 93 L. Ed. 2d 473 (1986)); *see Murphy v. Ohio*, 551 F.3d 485, 514 (6th Cir. 2009) (noting that defendant's "low intelligence alone does not make the officers' actions in questioning him coercive"). *But see Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002) ("[w]hen a suspect suffers from some mental incapacity, such as intoxication or retardation, and the incapacity is known to interrogating officers, a lesser quantum of coercion is necessary to call a confession into question") (quotation marks and citations omitted). In

15

analyzing whether a confession was involuntary due to police coercion, the Sixth Circuit employs a test that considers whether: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Mahan*, 190 F.3d at 422 (citation omitted).[8]

In *Macklin*, both defendants were considered "mildly retarded." 900 F.2d at 949. Mack had an IQ of 70 and was considered "borderline mentally retarded." Macklin had a full scale IQ of 59. While he could add and subtract two-digit numbers, make change, and remember and carry out one and two-step job instructions, he had a "severely limited capacity to understand verbal instructions." *Id*. The district court determined that the confessions were involuntary because it found that the defendants could not appreciate the consequences of confessing. The Sixth Circuit rejected this analysis, noting that there was nothing surrounding the defendant's confessions that "amounted to coercion." *Id*. at 952. The court observed that there was "no evidence of overreaching on the part" of the agents. *Id*.; *see also Garner v. Mitchell*, 557 F.3d 257 (6th Cir. 2009) (statements by individual with troubled upbringing, poor education, and an IQ of 76 were considered voluntary).

In *Lazaroff*, the defendant, who was completely deaf, was not provided an interpreter, though the police officer conducting the custodial interrogation was able to perform rudimentary (and comprehensible though not perfect) sign language. *Stanley v. Lazaroff*, 82 F. App'x 407

---

[8] In *Mahan*, the Sixth Circuit looked at the totality of the circumstances in determining whether the defendant's statement was the product of police coercion. In ultimately concluding that the statement was voluntary, the court relied on the fact that the defendant was not placed under arrest or threatened with arrest, the officers never brandished a weapon or used handcuffs, the defendant was free to leave the interview, the interview lasted only one and one half hours, and no promises or threats were made. *Mahan*, 190 F.3d at 422–23.

(6th Cir. 2003). The Sixth Circuit found that defendant's waiver of his *Miranda* rights was voluntary, despite the fact that he was not provided a certified sign language interpreter. First, the court found no evidence of police coercion. Second, the court also found that the waiver was with "full awareness" of the nature of the right he was abandoning and the consequences of that decision. In support, the court noted that the officer testified that he and defendant communicated for several hours the day defendant confessed, and during that time, defendant did not simply provide "yes" and "no" answers but provided rational developed answers to questions and even volunteered information and corrected one of his answers. The court ultimately found that defendant and the officer were "communicating effectively, though imperfectly, during the interview and issuance of *Miranda* warnings." *Id*. at 423. *See United States v. Hamberger*, No. 07-cr-165, 2008 WL 906133 (E.D. Wis. Mar. 31, 2009) (statements made by deaf suspect not suppressed where suspect appeared calm and comfortable, communicated effectively with officers, and did not request an interpreter); *see also United States v. Hamlett*, No. 4:18-cr-487, 2020 WL 5803307, at *8 (E.D. Ark. Sept. 29, 2020) (finding waiver of *Miranda* rights by deaf suspect voluntary, collecting cases finding effective waiver where deaf person has been subjected to a custodial interrogation without an interpreter); *United States v. Conquering Bear*, No. 3:17-cr-30110, 2018 WL 4334066, at *8 (D. S.D. June 29, 2018) (even though officers should have provided deaf suspect with interpreter, failure to provide one "was not a form of coercion sufficient to make his statements involuntary").

As an initial matter, the Court finds that it was clear from the recording of the interview that Pece was able to hear and understand the questions that were posed to him. His answers to the agents' questions were responsive and often included more than merely "yes" and "no"

answers, and at no time did he ask either agent to repeat any question or speak more loudly. Additionally, neither Pece nor his father ever indicated that Pece would be unable to communicate with the agents without the assistance of a sign language interpreter.[9]

Additionally—and critically—there was also no evidence that the agents either exerted any coercion on Pece during the interview or exploited his disabilities in order to obtain incriminating statements. The agents permitted Pece and his father to speak privately before the interview started. Once it began, the agents were calm and reserved; the interview, itself, lasted less than an hour; Pece was never placed under arrest (and, in fact, he was told at the start of the interview that he was not under arrest); the agents never brandished weapons or tried to restrain him; and they made no promise or threats. In fact, they candidly informed Pece that he was facing serious criminal charges.

Further, notwithstanding his mental and physical deficits, the record also shows that Pece was able to complete high school and college with accommodations. At the time of his arrest, Pece was employed full-time in the area of computer science, and he independently commuted five days a week between his house in Highland Heights and his job near the Cleveland Hopkins Airport. The questions he posed to the agents—especially questions of whether he would likely go to jail or lose his job—demonstrated that he appreciated the gravity of the situation. And contrary to the concerns raised by Drs. Lovinger and Karpawich, Pece did not agree with everything the agents said in an effort to please them or appear compliant. On at least two occasions, Pece strongly objected when the agents suggested that he might have blackmailed a

---

[9] As to this point, the Court had the opportunity to observe Pece at the hearing interacting with his counsel. While a sign language interpreter was provided for the proceedings, Pece often engaged in whispered conversations directly with his counsel without the assistance of the interpreter.

minor or had physical contact with one. In fact, throughout the interview, he answered some questions in the affirmative, answered others in the negative, and even suggested, at times, that he did not know the answer to the question.

The recording reflects that the exchange between the agents and Pece was generally measured, calm, and conversational; it was not coercive, overbearing, or confrontational. From the tenor and flow of the conversation, it was evident that Pece heard and understood the discussion, and willingly engaged with the agents.

Based upon the totality of the circumstances, the Court finds that Pece voluntarily spoke with agents on May 12, 2018 and that the statements he made during the interview are, therefore, admissible at trial.

### 2. Constitutionality of the Laptop Search

The Court likewise finds that on May 11, 2018, Pece voluntarily consented to the search of his laptop. Government officials may conduct a search without a warrant or probable cause based upon an individual's consent, so long as that consent (1) was voluntary and (2) came from someone authorized to give it. *See Fernandez v. California*, 571 U.S. 292, 294, 134 S. Ct. 1126, 188 L. Ed. 2d 25 (2014) (warrantless search upheld because wife gave consent to search residence). Any evidence discovered during a lawful consent search may be seized and admitted at trial. *See United States v. Matlock*, 415 U.S. 164, 177, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974) (holding proof of voluntary consent is sufficient to admit evidence at trial). In evaluating the voluntariness of consent to search, courts consider factors including the age, education, intelligence, legal knowledge or advice, length of detention, nature of questioning of the defendant, and the use of physical punishment. *Bustamante*, 412 U.S. at 226. The government

19

bears the burden of proving by a preponderance of the evidence that the consent was "'voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *United States v. Sheckles*, 996 F.3d 330, 346 (6th Cir. 2021) (citing *United States v. Lee*, 793 F.3d 680, 685 (6th Cir. 2015) and quoting *United States v. Alexander*, 954 F.3d 910, 918 (6th Cir. 2020)).

Here, the totality of the circumstances surrounding Dave and Pece's brief encounter with S.A. Desy demonstrates that Pece voluntarily surrendered his laptop and consented to its search. S.A. Desy was the only agent who met with Pece and his father in a public parking lot. He testified that his communications with Pece were limited to the execution of the consent and receipt forms and that he did not make any inquiries regarding the underlying criminal investigation. He read the consent form to Pece, including Pece's right to refuse consent, before Pece agreed to sign it. He further testified that Pece responded appropriately to his questions, including his request for the password. Additionally, he testified that he did not threaten Pece or make any promises to him, and Pece confirmed his consent by signing the consent form[10]. (*See* Gov. Ex. 1.) At no time during the meeting was Pece restrained or subjected to punishment. Indeed, there was nothing coercive about the encounter, or anything to suggest that Pece's "will was overborn[.]" *See Bustamonte*, 412 U.S. at 226. These facts demonstrate that Pece voluntarily consented to the search of the laptop.[11]

---

[10] Pece also testified at the hearing that none of the agents he came into contact with made him any promises or threatened him in any way.

[11] In his post-hearing brief, Pece insists that, on May 14, 2018, he "withdrew his consent to search the laptop when he called [S.A.] Christensen and said he wanted his laptop back." (Doc. No. 109 at 4, bolding omitted.) He argues that it does not matter that he did not explicitly state that he was "revoking consent" when he called, "he said he wanted his laptop back and that was enough to retract his consent." (*Id.*) However, the Court credits the testimony of S.A. Christensen regarding the contents of the call. He testified credibly that when Pece called on May 14th and asked if he could have his laptop back, the agent explained that the search of the computer was not yet complete. The agent specifically asked Pece if he was revoking his consent, and Pece replied that he was not. S.A. Christensen then informed Pece that if, at any time, he wished to revoke his consent, he should let the agent know. Under these circumstances, the Court finds that Pece did not revoke his consent for the search.

For the foregoing reasons, the Court denies Pece's motion to suppress the fruits of the search of the laptop and the statements he made to authorities.

## II.  MOTION TO REOPEN DETENTION HEARING

### A.  Relevant Background

Pece also seeks to reopen the detention hearing and requests that the Court release him on bond "on the basis of changed circumstances, to wit: 1) a psychological evaluation of [] Pece which demonstrates that his cognitive and hearing disabilities impair his ability to assist in his defense while in custody and mitigate his danger to the community; and 2) changed circumstances regarding his proposed residence, employment status and available supervisory conditions of release." (Doc. No. 86 at 1.) The government opposes the motion on the grounds that Pece has not established a change in circumstances sufficient to justify reopening the detention hearing.

To provide context for the present motion, it is necessary to briefly review the detention proceedings. At Pece's arraignment on July 14, 2020, the government moved for detention. (Doc. No. 8.) Pece was taken into custody, and, on July 21, 2020, Magistrate Judge Carmen E. Henderson conducted a detention hearing, pursuant to 18 U.S.C. § 3142. During the hearing, S.A. Christensen testified regarding the nature of his investigation into the online activities of Pece and his co-defendants. The agent testified to the evidence of child pornography, as well as evidence of Pece's efforts on Chateen.com to coerce minors to engage in sexual activities, that was located on Pece's laptop. He also testified that his search of the laptop revealed that a forensic tool known as "Eraser" had been used by Pece to delete files, notwithstanding the fact that he had previously warned Pece against altering his computer in any way.

21

The magistrate judge also heard testimony regarding Pece's premature birth and his resulting medical problems, including his partial hearing loss and cognitive deficits. Specifically, Pece's mother testified as to his low IQ, his inability to live alone or cook for himself, and the fact that he currently suffers from Licen planus oral, an autoimmune disease.

At the conclusion of the detention hearing, the magistrate judge concluded that although Pece presented sufficient evidence to rebut the presumption of detention created by 18 U.S.C. § 3142(e), there were no conditions that would reasonably assure the safety of any other person and the community, especially minors. In so ruling, she relied on the nature and circumstances of the offense, the weight of the evidence gleaned from S.A. Christensen's investigation regarding Pece's online activities with minors, the fact that Pece had a degree in computer science and utilized his knowledge of computers to attempt to destroy evidence, and the fact that Pece's mental and physical deficits did not preclude him from engaging in the activities identified in the indictment. (Doc. No. 20 (Transcript of Detention Hearing) at 55–58; Doc. No. 16 (Order of Detention).)

Pece moved the Court for revocation of the magistrate judge's detention order. (Doc. No. 27.) After conducting a *de novo* review of the record, the Court denied the motion, finding that the record established by clear and convincing evidence that no condition or conditions will reasonably assure the safety of any other person or the community. In so ruling, the Court found, consistent with the findings of the magistrate judge, that the charged offenses were serious and the weight of the evidence against Pece was strong. The Court also stressed the fact that Pece was able to commit the alleged crimes from the privacy of his father's home where he had been residing prior to his arrest. Additionally, it expressed its skepticism that any safety concerns

could be addressed by ordering him to have no internet access, as Pece had proposed, noting that courts had repeatedly found that limiting or prohibiting internet access to someone on release was a "near impossibility." (Doc. No. 73 at 14.)

### B. **Law and Discussion**

The Court has the authority to reopen a detention hearing at any time based on changed circumstances. A detention hearing "may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f).

New and material information for purposes of  § 3142(f) "consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event." *United States v. Jerdine*, No. 1:08-cr-481, 2009 WL 4906564, at *3 (N.D. Ohio Dec. 18, 2009) (citation omitted). The statutory provision authorizing the reopening of a detention hearing is strictly interpreted such that "hearings should not be reopened if the evidence proffered was available at the time of the hearing." *Id.*

The changed circumstances Pece relies upon are the afore-mentioned psychological report of Dr. Karpawich, written following his January 28, 2021 evaluation of Pece, and the fact that it is now possible for Pece to live in his mother's home. As to the former, the Court finds that the information contained in the report—much of which was addressed at the detention hearing—was available at the time Pece sought bond and, again, when he sought to revoke the

detention order. The fact that the defense subsequently elected to have Pece evaluated and a psychological report prepared does not change the fact that the issues relating to Pece's mental and physical deficits are not new and do not constitute a change in circumstances justifying the reopening of the detention hearing.

Pece also argues that circumstances have changed with respect to his housing options. In his motion, Pece explains that, when he was arrested, he was living with his father, Dave, who lives in Highland Heights, Ohio. His mother, Laurette Keider, lives with her husband, Mark Keider and his two sons in a home in North Royalton, Ohio. One of Mr. Keider's sons, Joey, was involved in a serious accident in 2019 and is paralyzed. "At the time of [Pece's] detention hearing in July, 2020, due to Joey's tremendous care needs and the family's continuing struggles to adapt to their circumstances, the Keider's were not in a position to have [Pece] live with them." (Doc. No. 86 at 7.) The Keider family now reports that Joey's condition has improved significantly, such that "Laurette and Mark are now able to welcome [Pece] back into their home where he lived with them and his half-siblings through high school." (*Id.*)

In connection with this proposed change of address, the Court ordered United States Pretrial Services to conduct an inspection of Pece's mother's residence and assess the dangers and risks associated with a potential bond placement there. According to the report prepared following the inspection, the home has internet access, all four inhabitants of the residence have cell phones, and there are multiple computers/devices in the home that can access the internet. (Doc. No. 108 at 2.) Mark Keider is employed in the area of internet security, and, according to the report, he ensures that the home computer network is secure and that all devices are password protected. Nevertheless, the report recommends that Pece continue to be detained. (*Id.*)

The Court agrees with the recommendation of the U.S. Pretrial Services that Pece's detention should continue. The Court will consider Pece's new proposal as if a change of circumstance has occurred. Nevertheless, the change of residence is not sufficient to alleviate the Court's concerns regarding Pece's access to the internet. While Mr. Keider works from home and has essentially agreed to supervise Pece, the fact remains that he and his wife maintain full-time employment in addition to their continuing obligations to care for Mr. Keider's disabled son. While it would appear that Pece's step-brother's condition has improved, he remains paralyzed and in need of on-going care. His step-father's ability to supervise Pece, therefore, is limited, at best.

This is especially troubling given the myriad of internet-capable devices available at the residence. Even under the best of circumstances, this Court and others have repeatedly acknowledged the near impossibility of policing or limiting a releasee's internet access. *See United States v. Galvan*, No. 3:20-cr-19, 2020 WL 4604502, at *6 (S.D. Tex. Aug. 11, 2020) (citing *United States v. Voelker*, 489 F.3d 139, 145 (3d Cir. 2007)); *see, e.g., United States v. Cornish*, 449 F. Supp. 3d 681, 686–87 (E.D. Ky. 2020) (danger that release of defendant charged with enticing a minor could result in internet access favored continued detention). Given the severity of the charged offenses, and Pece's education and experience with computers, the Court renews its finding that there are no conditions of release that will protect the public, and, in particular, minors. Accordingly, detention pending trial remains appropriate.

Case: 1:20-cr-00186-SL  Doc #: 124  Filed: 10/20/21  26 of 26.  PageID #: 824

### III. CONCLUSION

For the foregoing reasons, Pece's motion to suppress (Doc. No. 98) and motion to reopen the detention hearing (Doc. No. 86) are DENIED.

**IT IS SO ORDERED**.

Dated: October 20, 2021

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**